16-3540-ag
Cappetta v. Comm'r of Soc. Sec. Admin.

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2017

No. 16-3540-ag

_____

SALVATORE CAPPETTA,

*Petitioner*,

*v.*

COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,

*Respondent*.[*]

_____

ARGUED: DECEMBER 15, 2017

DECIDED: SEPTEMBER 14, 2018

_____

Before: WINTER, LYNCH, and DRONEY, *Circuit Judges*

Petitioner Salvatore Cappetta petitions for review of a decision of the Commissioner of the Social Security Administration, adopting the decision of the Departmental Appeals Board (DAB), and imposing an assessment of $47,583.60 and penalty of $106,000 on Cappetta for

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

his failure to report work activity while receiving Social Security disability insurance (SSDI) benefits. We agree with the DAB that Cappetta's failure to report work activity to the Social Security Administration was "material" for purposes of 42 U.S.C. § 1320a-8, which authorizes the Commissioner of Social Security to impose an assessment and penalty for an SSDI recipient's withholding of information in connection with the receipt of benefits. We also reject Cappetta's other challenges to the DAB's authority to impose the assessment and penalty in this case. However, we conclude that the DAB lacked substantial evidence to support the amounts of the assessment and penalty it imposed because (1) Cappetta's earnings from work activity did not amount to "substantial gainful activity," (2) Cappetta remained disabled while failing to report work activity, and (3) the findings of fact on which the DAB relies establish only that Cappetta's work was "sporadic." Accordingly, we **GRANT** the petition for review, **VACATE** the DAB's decision, and **REMAND** for further proceedings consistent with this opinion.

---

EDWARD A. WICKLUND (Nathaniel V. Riley, *on the brief*), Olinsky Law Group, Syracuse, NY, *for Petitioner*.

NATALIE N. ELICKER, Assistant United States Attorney (Sandra S. Glover, *on the brief*), *for* John H. Durham, United States Attorney for the District of Connecticut, New Haven, CT, *for Respondent*.

DRONEY, *Circuit Judge*:

In 2009, an anonymous tipster reported to the Social Security Administration (SSA) that petitioner Salvatore Cappetta was working and earning substantial sums while receiving Social Security disability insurance (SSDI) benefits. A subsequent investigation by the Social Security Administration's Inspector General (SSA IG) concluded that Cappetta had failed to report work activity while receiving SSDI benefits. The SSA IG ordered Cappetta to pay more than $200,000 as an assessment and penalty for his failure to report.

Cappetta appealed the decision to an administrative law judge (ALJ), who concluded that Cappetta's failure to report work activity was not "material" for the purposes of 42 U.S.C. § 1320a-8 and that Cappetta therefore was not subject to an assessment or penalty under that statute. The SSA IG appealed to the Departmental Appeals Board (DAB), which reversed and remanded to the ALJ. After the ALJ again concluded that no assessment or penalty was appropriate, the DAB

3

reversed for a second time and imposed its own assessment and penalty. Cappetta now petitions for review.

In his petition, Cappetta raises various legal and factual challenges to the DAB's decision. We reject Cappetta's legal challenges and hold that the DAB had the authority to impose an assessment and penalty on Cappetta because a failure to report any work activity—even if the earnings from that work activity do not amount to "substantial gainful activity"—is "material" under 42 U.S.C. § 1320a-8(a). However, we also conclude that the DAB's assessment and penalty were not supported by substantial evidence, and accordingly we vacate and remand for further proceedings.

**BACKGROUND**

We begin by summarizing the statutory framework at issue in this case, which our Court has never had occasion to address. We then turn to the facts and procedural history before considering the parties' arguments.

4

**I.    Statutory Framework**

Under 42 U.S.C. § 1320a-8 the Commissioner of the Social Security Administration (the "Commissioner") may impose an assessment and civil monetary penalty on a Social Security benefits recipient for failing to disclose a fact that is "material" to "any initial or continuing right to . . . monthly insurance benefits." 42 U.S.C. § 1320a-8(a)(1)(C). The central issue in this appeal is whether evidence of work activity is considered "material" under § 1320a-8(a). Section 1320a-8(a)(1) authorizes "penalties" of up to $5,000 for "each" material false statement or omission, and an "assessment" that is "not more than twice the amount of benefits or payments paid as a result of such a statement or representation or such a withholding of disclosure." The Commissioner must consider a number of different factors when determining the appropriate amount of a penalty or assessment, including

> (1) the nature of the statements, representations, or
> actions referred to in subsection (a) of this section and the

circumstances under which they occurred; (2) the degree of culpability, history of prior offenses, and financial condition of the person committing the offense; and (3) such other matters as justice may require.

*Id.* § 1320a-8(c).

Under SSA regulations implementing § 1320a-8, the Commissioner has delegated the authority to impose assessments and penalties to the SSA Inspector General's office. *See id.* § 1320a-8(i) (authorizing delegation to Inspector General); 20 C.F.R. § 498.102(a) ("The Office of the Inspector General may impose a penalty and assessment . . . ."). An individual facing an assessment or penalty that the SSA IG imposes is entitled to "written notice and an opportunity for the determination to be made on the record after a hearing at which the person is entitled to be represented by counsel, to present witnesses, and to cross-examine witnesses against the person."[1] 42 U.S.C. § 1320a-8(b)(2); *see also* 20 C.F.R. § 498.202.

---

[1] That language triggers the SSA's obligation to comply with the formal adjudication requirements of the Administrative Procedure Act (APA). *See, e.g., Am. Tel. & Tel. Co. v. FCC*, 572 F.2d 17, 21-22 (2d Cir. 1978) ("The APA requires

6

The hearing required by § 1320a-8(b)(2) takes place before an ALJ . 20 C.F.R. § 498.202. Once an ALJ renders a decision, "[a]ny party may appeal the decision of the ALJ to the DAB by filing a notice of appeal with the DAB within 30 days of the date of service of the initial decision." *Id.* § 498.221(a).[2] "The DAB may remand a case to an ALJ for further proceedings, or may issue a recommended decision to decline review or affirm, increase, reduce, or reverse any penalty or assessment determined by the ALJ." *Id.* § 498.221(h). The DAB's recommended decision becomes the Commissioner's final decision 60 days after the DAB serves the decision on the parties, unless the decision is remanded to the ALJ or the Commissioner modifies the

---

trial-type hearings only '(w)hen rules (or adjudications) are required by statute to be made (or determined) on the record after opportunity for an agency hearing.' Since *United States v. Florida East Coast Ry.*, 410 U.S. 224, 236-38, 93 S. Ct. 810, 35 L.Ed.2d 223 (1973), the words 'on the record' have become, as the District of Columbia Circuit has observed, a 'touchstone test' for the applicability of the APA's trial-type procedures." (internal citation omitted)).

[2] The Departmental Appeals Board is part of the Department of Health and Human Services. 20 C.F.R. § 498.201.

decision. *Id.* § 498.222(a). In the event of an adverse decision, an individual may appeal the Commissioner's decision to the U.S. Court of Appeals "for the circuit in which the person resides, or in which the [material] statement or representation . . . was made." 42 U.S.C. § 1320a-8(d)(1); *see also* 20 C.F.R. § 498.127.

## II.    Factual Background

Petitioner Salvatore Cappetta first began receiving Social Security disability benefits in 1997, after the SSA determined that Cappetta was disabled "due to rheumatoid arthritis, [a] heart condition, and headaches." AR 109.[3] Prior to receiving SSDI, Cappetta owned and operated a construction business.

On June 16, 2009, an anonymous individual contacted the SSA to report concerns that Cappetta might be receiving disability benefits unlawfully. According to the caller, Cappetta was engaged in a major home renovation (including the construction of an above-ground

---

[3] We use "AR" as shorthand to refer to the administrative record.

8

pool) and had stated that he (Cappetta) worked for Peter Cameron Construction, earning money that he was not reporting to the SSA. Based on the tip, the SSA IG began to investigate Cappetta. The SSA IG first reviewed Cappetta's history of disability and reported work, and found that Cappetta had never reported performing any work after 1999. Then, in August 2009, an SSA IG investigator conducted surveillance of Cappetta, during which the investigator observed Cappetta leaving his house to obtain an item for the construction that was underway at his house. The investigator did not observe Cappetta engaging in any labor or other work, including for Cameron Construction.

On November 6, 2009, investigators interviewed Peter Cameron, who owned Cameron Construction. According to the investigators' unsworn report, Cameron stated that Cappetta had worked for the company for eight years and that Cappetta's pay varied from job to job and week to week (ranging from $50 to $500 a

9

job, and $150 to $1500 a week). The report also stated that Cameron denied paying Cappetta substantial sums such as $20,000 to $30,000 a year. During a second interview in February 2010, the investigators reported that Cameron further detailed Cappetta's work for the company, including Cappetta's assistance with "tiling backsplashes, walls, and floors; hanging doors; trim work, framing, and taping sheetrock." AR 111.

On the same day of Cameron's first interview in November 2009, investigators also interviewed Cappetta. During the interview, Cappetta admitted that he worked sporadically for Cameron and received assistance from Cameron on his house in exchange for his help for Cameron Construction. However, Cappetta denied being paid for his work. A few days later, investigators continued the interview, and Cappetta signed a sworn statement. In that statement, Cappetta asserted that he had not been employed since receiving disability benefits.

On July 26, 2012, following its investigation, the SSA IG issued a decision concluding that Cappetta had worked "from November 2002 through April 2011" while receiving SSDI benefits. AR 1215. The SSA IG concluded that Cappetta made 53 material omissions by failing to report work activity each month from December 2006 until April 2011 (a period of 53 months).[4] During that time, Cappetta and his children received $47,583.60 in benefits. Using those amounts, the SSA IG informed Cappetta that it would assess him $95,167.20 (twice the amount of benefits received from December 2006 to April 2011)

---

[4] In 2004, Congress amended 42 U.S.C. § 1320a-8(a) to permit SSA to impose an assessment and penalty for a Social Security benefits recipient's "withhold[ing]" of information from the SSA. *See* Social Security Protection Act of 2004, Pub. L. No. 108-203, § 201, 118 Stat 493, 507 (2004) (codified at 42 U.S.C. § 1320a-8(a)). According to the SSA IG, the relevant amendments in the Act became effective in late November 2006, and therefore December 2006 served as the starting point for imposing an assessment and penalty on Cappetta. AR 31, 1215; *see also* Social Security Protection Act of 2004 § 201(d), 118 Stat 493, 508 (describing conditions for effective date of amendments to 42 U.S.C. § 1320a-8(a)).

and issue a penalty of $106,000 ($2,000 for each month Cappetta failed to report work activity). The total came to $201,167.20.[5]

Cappetta exercised his right to contest the SSA IG's decision before an ALJ. The hearing before the ALJ featured a number of witnesses, including an SSA IG investigator, an SSA claims representative, Cameron, and Cappetta. The investigator testified about her interviews with Cameron and Cappetta, which are detailed above. The claims representative testified about her work reviewing Cappetta's file and the SSA IG investigation materials. In particular, the claims representative detailed how she used interview notes from the SSA IG investigators' interview with Cameron to conclude that Cappetta had engaged in "substantial gainful activity" while receiving disability benefits. That level of earnings and work would have disqualified Cappetta from receiving further disability benefits

---

[5] The SSA IG also twice requested that the U.S. Attorney's Office for the District of Connecticut criminally prosecute Cappetta for his failure to report work activity. That office declined both requests.

and would mean that Cappetta unlawfully received benefits for many years.

Cappetta's testimony was largely consistent with the statements that the SSA IG attributed to him in his interviews. During the hearing, Cappetta stated that he did "little things" to assist Cameron, received small payments in exchange as gifts, and received some funds from Cameron to help finance a trip to Italy. AR 324. Cappetta denied that he worked for Cameron. Significantly, however, Cappetta also acknowledged that he knew he had to report any work that he performed to the SSA.

In contrast to Cappetta, Peter Cameron's testimony diverged considerably from the statements that the SSA IG attributed to him in its investigative report. In his testimony, as described in the ALJ's decision, Cameron "denied that [Cappetta] ever worked for him[,] but testified that [Cappetta] would show-up at job sites and run to the store for him if he needed materials. [Cameron] denied paying

13

[Cappetta] wages but [also said that] by running errands for him [Cappetta] was paying [Cameron] back for work [that] Cameron did on his house." AR 113 (citations omitted). Cameron also acknowledged during the hearing that Cappetta would give advice on how to perform certain construction work, given Cappetta's background in the field. In addition, Cameron "testified that he gave [Cappetta] gifts at Christmas; he gave him money for his kids' birthdays; and he gave him a couple hundred bucks when he went to Italy. He also gave [Cappetta] money to go get coffee and donuts and for the gas [Cappetta] used going to the store." AR 113 (citations omitted).

## III.   Procedural History

The ALJ issued his first decision on June 11, 2014. In the decision, the judge rejected the SSA IG's conclusion that Cappetta engaged in substantial gainful activity, finding that the claims representative's testimony was "not credible" because both the

statements that Cameron made to investigators and at the ALJ hearing provided an insufficient evidentiary basis to conclude that Cappetta was engaged in substantial gainful activity. AR 261; *see also* AR 263 (reasoning that the "evidence [did] not show . . . when and how frequently gainful work activity was actually performed").

However, the ALJ determined that Cappetta did perform some work, despite his statements to the contrary. The ALJ noted that Cappetta "admitted that he ran errands for Peter Cameron and that he received money, items of value, or in kind labor on his house from Peter Cameron." AR 263. The ALJ concluded that Cappetta "did engage in some gainful work activity for Peter Cameron." AR 263. Nevertheless, the ALJ also concluded that imposing any assessment or penalty was unreasonable, reasoning that Cappetta's failure to report his work was not "material" because Cappetta had received disability benefits for more than 24 months and thus his work activity

15

could not be used as evidence of his disability under 42 U.S.C. § 421(m)(1)(B).

The SSA IG appealed, and the DAB reversed and remanded to the ALJ. The DAB first ruled that a failure to report work activity is always material for purposes of 42 U.S.C. § 1320a-8(a), rejecting the ALJ's conclusion to the contrary. The DAB then listed additional findings of fact that it expected the ALJ to make on remand and reminded the ALJ of his obligation to consider certain statutory factors when reviewing the SSA IG's assessment and penalty decision.

On remand, the ALJ again determined that no assessment or penalty was appropriate. The ALJ first requested that the DAB re-visit its legal decision, asserting once again that a failure to report work activity after the initial 24-month eligibility period is not a material omission for purposes of issuing a civil monetary penalty or an assessment. He then turned to assessing the statutory factors that the

DAB had ordered him to consider. The ALJ noted that Cappetta knew that he needed to report some work activity to the SSA, but nevertheless concluded that Cappetta did not understand that he needed to report the type of work that he performed for Cameron or whether his failure to report work activity constituted a material fact under 8 U.S.C. § 1320a-8(a). According to the ALJ, Cappetta's lack of knowledge was partly attributable to his limited command of English.

The ALJ also noted problems with the investigators' unsworn reports of Cameron's statements about paying Cappetta, concluding that Cameron's "sworn hearing testimony that was subject to cross-examination must be accorded more weight." AR 133. Moreover, he concluded that there was "no dispute" that Cappetta did not engage in work activity after November 2009. AR 131. Although the decision reiterated the finding that Cappetta "engaged in work activity, including running errands, for Peter Cameron or Cameron Construction," and found that it was more likely than not that this

17

work occurred "as early as 2001," the ALJ nevertheless concluded that Cappetta's work was only "sporadic," and his conduct not "blameworthy." AR 133, 135–136. Accordingly, the ALJ again determined that no assessment or penalty was appropriate.

The SSA IG appealed once more to the DAB. The DAB rejected the ALJ's request to revisit its previous decision about reporting work activity, and again decided that work activity is a material fact under the civil monetary penalty statute for all SSDI beneficiaries. The DAB also concluded that the ALJ erred in weighing the relevant factors when reviewing the SSA IG decision to impose an assessment and penalty. The ALJ's role, stated the DAB, is to assess whether the SSA IG's proposed assessment and penalty is reasonable. The DAB then explained that to make this determination, an ALJ should apply the statutory factors, which include

> (1) the nature of the statements, representations, or actions and the circumstances under which they occurred; (2) the degree of culpability of the person committing the offense; (3) the history of prior offenses

18

of the person committing the offense; (4) the person's financial condition; and (5) such other matters as justice may require.

AR 44 (citing 42 U.S.C. § 1320a-8(c) and 20 CFR § 498.106(a)).

Applying these factors, the DAB determined that Cappetta was in fact culpable, reversing the ALJ's finding. First, the DAB rejected the ALJ's conclusion that Cappetta required actual knowledge of the need to report the type of work activity that he performed for Cameron in order to face liability. Second, the DAB "reject[ed] the ALJ's suggestion that [Cappetta's] limited English language skills may have affected his ability to understand his duty to report . . . ." AR 47. Instead, the DAB emphasized that Cappetta had engaged in some work activity, that he knew he was supposed to report such activity to the SSA, and that he failed to report his work activity over many years. On the basis of this information, the DAB concluded that the SSA IG had shown "substantial culpability." AR 48.

Turning to the other factors, the DAB stated that it would generally defer to the ALJ's findings of fact and credibility findings. Then, reviewing the testimony, the DAB agreed with the ALJ that "the evidence of record does not establish the value of [Cappetta's] work activity." AR 49. The DAB also approvingly noted the ALJ's finding that Cappetta's work was "sporadic"—but it rejected any suggestion that the work activity was "minimal in nature" and instead concluded that Cappetta's work was "significant." AR 49–50.

Finally, the DAB turned to the question of an appropriate amount for an assessment and penalty. The DAB reduced the SSA IG's assessment amount by half, to $47,583.60, reasoning that the "evidence is not sufficient" to support the SSA IG's amount because Cappetta's work was not "continuous." AR 50. But the DAB affirmed the penalty amount of $106,000, which "reflect[ed] a reduction to less than half the amount the SSA I.G. could have imposed." AR 51. As a result, the total assessment and penalty came to $153,583.60. The

20

Commissioner of the Social Security Administration adopted the DAB's decision, making the decision final. *See* 20 C.F.R. § 498.222. Cappetta then petitioned this Court for review.

Before we consider Cappetta's arguments, we note one additional point of background and procedural history. In 2010, the SSA determined that Cappetta's medical condition had improved and that he was no longer disabled. Cappetta appealed that determination, and in early 2012, the agency ultimately concluded that Cappetta was in fact disabled and eligible to continue receiving disability benefits. The lead SSA IG investigator subsequently intervened, and it appears that the SSA terminated Cappetta's benefits because of the work activity that the investigator claimed Cappetta had performed. The record is unclear as to whether Cappetta is now receiving benefits, but the government does not contest that Cappetta was disabled during the time that he failed to report, and that he remained disabled at least up until the hearings

21

before the ALJ. The DAB did not discuss Cappetta's continuing disability when analyzing the statutory factors for setting an assessment and penalty.

**DISCUSSION**

In his petition for review, Cappetta raises various legal and factual challenges to the DAB's decision. His principal argument is the same one endorsed by the ALJ: that a failure to report work activity after having received disability benefits for 24 months is not "material" for purposes of 42 U.S.C. § 1320a-8(a). In addition, Cappetta also contends that only a failure to report work activity amounting to substantial gainful activity is material, that the DAB lacked authority to recommend an assessment and penalty, and that he withheld information only once, rather than 53 times (which was the basis for the large penalty amount). Finally, Cappetta argues that the agency lacked substantial evidence for the assessment and penalty amount that it imposed. We address each of these arguments below.

**I.    Standard of Review**

At the outset, we determine whether we accord the DAB's legal conclusions, which were adopted by the Commissioner of Social Security, the same deference we give other formal agency decisions from the Commissioner or DAB. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The government briefly asserts in its brief that we must do so, citing *Lawrence + Memorial Hospital v. Burwell*, 812 F.3d 257, 264 (2d Cir. 2016). *Lawrence*, however, applied *Chevron*'s framework to the Secretary of Health and Human Services' interpretation of a Medicare provision—an area of federal law that the Department of Health and Human Services (DHHS) administers. *Id.*; *see also* 42 U.S.C. §§ 1395ff, 1395kk.

By contrast, here, the DAB—which is part of DHHS, not the SSA—interpreted parts of federal social security law, an area of law that Congress has entrusted to a different agency, the Social Security Administration. *See* 42 U.S.C. § 901 (establishing Social Security

23

Administration as an independent executive agency charged with overseeing Social Security programs). However, through SSA regulations, the Commissioner tasked the DAB with providing ALJ administrative hearings and then reviewing the resulting decisions for cases involving an assessment and penalty under 42 U.S.C. § 1320a-8. *See* 20 C.F.R. §§ 498.201–498.202, 498.221. After the DAB's process is complete, its final decision becomes the Commissioner's decision unless the DAB remands the decision to the ALJ. *Id.* § 498.222(a).

That arrangement raises a question about the deference we give to the DAB's legal interpretation, because "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S.

218, 226–27 (2001); *see also Gonzales v. Oregon*, 546 U.S. 243, 258–68 (2006) (declining to accord *Chevron* deference to Attorney General where AG was not delegated authority to interpret the provision at issue). However, whether an agency administers a statute is not the only relevant factor to accord that agency *Chevron* deference. As the *Mead* Court explained, another "very good indicator of delegation meriting *Chevron* treatment [is] express congressional authorization[] to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." 533 U.S. at 229. In such circumstances, "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id.* at 230; *see also Estate of Landers v. Leavitt*, 545 F.3d 98, 105–07 (2d Cir. 2008) (applying *Mead* factors to internal agency manual and declining to accord *Chevron* deference).

Here, that guidance easily resolves the *Chevron* question. First, the Commissioner of the Social Security Administration ultimately adopts the DAB's decision when setting an assessment and penalty. 20 C.F.R. § 498.222(a). Although the Commissioner delegates the authority to review SSA IG decisions to another federal agency, the decision becomes that of the Commissioner, and the DAB's decisions are therefore "promulgated in the exercise of th[e] authority" given to the Commissioner. *Mead*, 533 U.S. at 227. Second, as we explained above, Congress intended for the Commissioner to use the Administrative Procedure Act's framework for formal adjudication, another strong indicator that *Chevron*'s framework applies. *See* 42 U.S.C. § 1320a-8(b)(2); *Mead*, 533 U.S. at 229.

Having decided that the *Chevron* framework applies, we briefly review that standard and the "substantial evidence" standard that applies to Cappetta's factual challenges. *Chevron* requires us to apply a two-step inquiry to an agency's interpretation of a statute. At the

first step of the analysis, a reviewing court must ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If the statute is ambiguous, then at the second step "the question for the court is whether the agency's answer is based on a permissible construction of the statute," *id.* at 843, in other words, whether the agency's interpretation is "reasonable," *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).

As for Cappetta's factual challenges, § 1320a-8(d)(2) provides that "[t]he findings of the Commissioner . . . if supported by substantial evidence on the record considered as a whole, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Yancey v. Apfel*,

145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

**II.     Whether A Failure to Report Work Activity is "Material" for the Purposes of 42 U.S.C. § 1320a-8(a)**

The threshold issue is whether the Commissioner had the authority to impose an assessment and penalty for Cappetta's failure to report work activity. Understanding that issue requires some background on the law governing an SSDI recipient's eligibility for benefits.

To obtain Social Security disability benefits, an applicant must show in part that he or she "is under a disability," 42 U.S.C. § 423(a)(1)(E), which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be . . . expected to last for . . . not less than 12 months," *id.* § 423(d)(1)(A). To assess whether an

28

applicant can perform "substantial" activity, the SSA examines the type of work that an applicant is capable of performing. *See* 20 C.F.R. § 404.1572(a); *see also id.* § 404.1571 ("The work . . . that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. If you are able to engage in substantial gainful activity, we will find that you are not disabled.); *id.* § 404.1573 (using the circumstances of an applicant's employment to determine if the individual is disabled). The definition for "gainful" explains that the work activity must be done "for pay or profit." *Id.* § 404.1572(b).

Once an individual is receiving SSDI benefits, that recipient is subject to certain reporting and review requirements to ensure his or her continuing eligibility. *See* 42 U.S.C. § 421(i); *see also* 20 C.F.R. § 404.1589 ("After we find that you are disabled, we must evaluate your impairment(s) from time to time to determine if you are still eligible for disability cash benefits."). However, certain restrictions

29

apply to the Commissioner's review of whether an individual remains disabled. Most significantly for our purposes, 42 U.S.C. § 421(m) provides that:

(1) In any case where an individual entitled to disability insurance benefits . . . has received such benefits for at least 24 months
(A) no continuing disability review conducted by the Commissioner may be scheduled for the individual solely as a result of the individual's work activity; [and]
(B) no work activity engaged in by the individual may be used as evidence that the individual is no longer disabled . . . .
(2) An individual to which paragraph (1) applies shall continue to be subject to
(A) continuing disability reviews on a regularly scheduled basis that is not triggered by work; and
(B) termination of benefits under this subchapter in the event that the individual has earnings that exceed the level of earnings established by the Commissioner to represent substantial gainful activity.

Cappetta argues that 42 U.S.C. § 421(m)(1) makes "work activity" irrelevant for a continuing disability review, and as a result, his failure to report that activity cannot be "material" for purposes of

30

42 U.S.C. § 1320a-8(a). As we described above, § 1320a-8(a)(1)(C) authorizes the Commissioner to impose an assessment and penalty where a SSDI recipient "omits from a statement or representation . . . or otherwise withholds disclosure of, a fact which the person knows or should know is material to the determination of any initial or continuing right to or the amount of monthly insurance benefits."

According to the Commissioner and the DAB, § 421(m)(2)(B) defeats Cappetta's argument. That section permits the Commissioner to terminate benefits if an SSDI recipient's earnings exceed the level that amounts to "substantial gainful activity." 42 U.S.C. § 421(m)(2)(B). However, SSA regulations make work activity relevant to calculating substantial gainful activity. The SSA looks primarily to earnings "from your work activity as an employee" to determine if an SSDI recipient has "engaged in substantial gainful activity." 20 C.F.R. § 404.1574(b)(2). The Commissioner and DAB conclude from this definition that reporting work activity is "material" under 42 U.S.C.

1320a-8(a), because the SSA must first determine whether a recipient's earnings derive from work activity to determine whether they are relevant earnings for purposes of continuing SSDI eligibility. The Commissioner notes that that interpretation is consistent with the statute, because the SSA still may not use the work activity as evidence that an SSDI recipient is no longer physically disabled.

We agree, and conclude that the Commissioner may properly consider a failure to report work activity that generates profit or pay "material" for purposes of § 1320a-8, and that the plain text of the statute authorizes the Commissioner to do so. As a result, we resolve this first issue at *Chevron* step one.

Section 423(d)(1)(A) conditions SSDI benefits on the inability to perform substantial gainful activity. As we have explained, SSA regulations in turn define substantial gainful activity as earnings derived largely from work—a definition that Cappetta has *not* challenged in his petition for review. 20 C.F.R. §§ 404.1572, 404.1574.

Congress explicitly made those earnings relevant to continuing eligibility under 42 U.S.C. § 421(m)(2)(B), thus connecting earnings that amount to substantial gainful activity to an SSDI recipient's continued eligibility. Thus, although § 421(m)(1) makes "work activity" irrelevant as both a reason to conduct a continuing disability review, and as evidence in such a review, the statute just as clearly permits the SSA to consider substantial gainful activity to terminate benefits. *See* 42 U.S.C. § 421(m)(2)(B); *see also* Exemption of Work Activity as a Basis for a Continuing Disability Review, 71 Fed. Reg. 66840, 66846 (Nov. 17, 2006) (explaining that SSA would not use work activity to determine continuing physical disability, but that work activity can be used to assess whether an SSDI recipient generates earnings amounting to substantial gainful activity). As a result, the DAB correctly concluded that failing to report work activity is material under § 1320a-8.

The legislative history further supports our conclusion that the agency's interpretation is correct.[6] A committee report for the Ticket to Work and Work Incentives Improvement Act of 1999, which made changes to continuing disability reviews for SSDI recipients, explains that those changes were "intended to encourage long-term SSDI beneficiaries to return to work by ensuring that work activity would not trigger an unscheduled medical review of their eligibility." H.R. Rep. 106-393(I), at 45 (1999). The report then explains that "like all beneficiaries, long-term beneficiaries would have benefits suspended if earnings exceeded the substantial gainful activity level, and would

---

[6] As we have previously observed, the Supreme Court has sent "mixed messages" about whether we may consider legislative history when determining whether a statute is ambiguous at *Chevron* step one. *Coke v. Long Island Care At Home, Ltd.*, 376 F.3d 118, 127 & n. 3 (2d Cir. 2004), *vacated on other grounds by Long Island Care At Home, Ltd. v. Coke*, 546 U.S. 1147 (2006). Given that the legislative authority speaks directly to the issue Cappetta raises, we find it appropriate to supplement our analysis with the legislative history here. *Cf. United States v. Gayle*, 342 F.3d 89, 94 (2d Cir. 2003) ("As a general matter, we may consider reliable legislative history where, as here, the statute is susceptible to divergent understandings and, equally important, where there exists authoritative legislative history that assists in discerning what Congress actually meant.").

be subject to periodic continuing disability reviews." *Id.* Those observations support the Commissioner's reading of the statute, because they demonstrate Congress's clear intent to continue making substantial gainful activity—which the SSA assesses by looking primarily at earnings derived *from work*—relevant and applicable to SSDI beneficiaries.

As a result, the DAB correctly concluded that a failure to report work activity is material under 42 U.S.C. § 1320a-8(a). Cappetta's failure to make such reports consequently made him subject to a potential assessment or penalty under § 1320a-8.[7]

---

[7] SSA regulations unambiguously require SSDI beneficiaries to report work activity to the agency. *See* 20 C.F.R. § 404.1588. That reporting requirement and Cappetta's own admission that he knew he needed to report work activity resolve any question that the complex interplay between the statutory provisions at issue in this case left Cappetta without notice.

**III.    Cappetta's Remaining Legal Challenges**

Cappetta also raises four other questions of law that challenge the Commissioner's authority to impose an assessment and penalty in this case. We find each of his arguments also unavailing.

First, Cappetta contends that a failure to report work activity is material only if the work activity amounts to substantial gainful activity. We conclude otherwise. If adopted, the approach Cappetta urges would assign SSDI recipients responsibility to determine whether their work activity was significant enough to disqualify them for benefits, and potentially allow broad claims of good faith if a beneficiary made the wrong call. However, calculating whether earnings amount to substantial gainful activity that prevent the continuing receipt of disability benefits is a complex undertaking that requires the SSA to have a complete picture of a SSDI recipient's earnings. *See* 20 C.F.R. §§ 404.1574, 404.1592–404.1592a. Thus, requiring SSDI recipients to report all work activity, as the SSA does,

36

*see* 20 C.F.R. § 404.1588, helps to ensure an efficiently-administered program and to prevent fraud. Accordingly, we agree with the Commissioner that a failure to report work activity, even if that activity is not substantial and gainful, may be considered "material" under 42 U.S.C. § 1320a-8(a).[8]

Second, Cappetta asserts that the DAB may not impose an assessment or penalty where the ALJ did not first recommend an assessment or penalty. In support of that argument, Cappetta points to 20 C.F.R. § 498.221(h), which states that the "DAB may remand a case to an ALJ for further proceedings, or may issue a recommended decision to decline review or affirm, increase, reduce, or reverse any penalty or assessment determined by the ALJ." 20 C.F.R. § 498.221(h). Cappetta points to the phrase "any penalty or assessment determined by the ALJ" to contend that the DAB "fundamentally misunderstood

---

[8] However, as we discuss in section IV, *infra*, whether the work activity amounts to substantial gainful activity is relevant to whether an assessment is appropriate and the amount of any penalty.

its role in the appeals process" because the "regulation itself does not appear to vest the DAB with the authority to find liability in cases . . . w[h]ere the ALJ did not issue any penalty or assessment." Pet'r's Br. 51–52.

That argument is also unavailing. The SSA regulations make clear that the DAB may "reverse" an ALJ decision and that it may adjust the amount of an assessment and penalty as part of its review. 20 C.F.R. 498.221(h). That power includes the ability to reverse an ALJ's decision setting no assessment or penalty. As a result, the DAB acted within its authority by imposing the assessment and penalty in this case.

Third, Cappetta also argues that the Commissioner may not impose a penalty for each month that he failed to report work activity. According to Cappetta, § 1320a-8 "proscribes 'omissions' only when accompanied by 'statements.'" Appellant's Br. 53. Cappetta claims that his only "statement" was the one he made to investigators in

November 2009, when he claimed he had not worked for Peter Cameron.[9]

The plain text of 42 U.S.C. § 1320a-8 resolves Cappetta's argument. Section 1320a-8(a) authorizes a penalty where "[a]ny person . . . omits from a statement or representation . . . , *or otherwise withholds disclosure of*, a fact which the person knows or should know is material to the determination of any initial or continuing right to or the amount of monthly insurance benefits." 42 U.S.C. § 1320a-8(a)(1) (emphasis added). That section then provides a penalty for "*each* such statement *or* representation *or* each receipt of such benefits or payments while withholding disclosure of [a material] fact." *Id.* (emphasis added). By separating omissions involving a statement

---

[9] The Commissioner argues that Cappetta waived this argument because he failed to raise it before the agency. We decline to hold that Cappetta waived or failed to exhaust this argument because he did not have an opportunity to raise this issue. Until this petition for review, SSA IG was the appealing party, and Cappetta was merely responding to SSA IG's arguments because he had successfully argued that no assessment or penalty was appropriate. Accordingly, we consider Cappetta's argument on the merits.

from situations involving the "withholding" of facts, the statute unambiguously permits imposing a penalty for each month that a SSDI recipient withholds material information while receiving benefits, such as the situation here. Indeed, it is the SSA's practice to view each month in which material information is concealed or omitted as a separate false statement or misrepresentation. *See, e.g.*, Inspector Gen. of Soc. Sec. Admin. v. Antone, CR4051 (Departmental Appeals Board July 20, 2015) (applying penalties in the amount of $500 per month, where there was a total concealment period of 62 months).

However, we note one substantial, but separate, concern with the agency's timeframe for imposing penalties and for calculating the amount of benefits that Cappetta received when considering the assessment. The ALJ concluded, and the parties do not dispute, that Cappetta did not perform any work activity after November 2009. Nevertheless, the Commissioner imposed a penalty on Cappetta for

his receipt of benefits for each month thereafter until April 2011 and used that same date to calculate the amount Cappetta improperly received in benefits, with no explanation. If Cappetta was not working from November 2009 until April 2011, then he had no earnings to report to the SSA, and the Commissioner could not impose a penalty on him for that period under § 1320a-8(a). Furthermore, it is also unclear why the DAB relied on that April 2011 date when calculating the amount of benefits that Cappetta improperly received. We trust that, on remand, the DAB will either explain the legal basis for the timeframe it used, or adjust the timeframe for the assessment and the penalty accordingly.

Finally, Cappetta argues that the DAB erred by considering his failure to report work activity prior to November 27, 2006, when determining the degree of his culpability. That date is significant because it is the date when the Commissioner could first begin

41

imposing an assessment and penalty on SSDI recipients for withholding material information.[10] *See supra* n.4.

We conclude that the DAB was entitled to consider Cappetta's failure to report work activity prior to November 27, 2006. First, the SSA IG appropriately limited the assessment and penalty it sought to impose to any activity following November 27, 2006. As a result, Cappetta was not ordered to pay for an omission for which the Commissioner could not impose an assessment and penalty at the time the omission occurred. Second, the SSA required Cappetta to report any work activity long before November 2006. *See* Federal Old Age, Survivors, and Disability Insurance Benefits; Supplemental Security Income for the Aged, Blind, and Disabled, 45 Fed. Reg. 55566, 55596 (Aug. 20, 1980) (implementing work reporting requirement). Thus, Cappetta's failure to report work activity beginning in 2001

---

[10] The government also argues that Cappetta waived this argument, but for reasons we discussed in footnote 9, we again reach the merits of Cappetta's arguments.

42

does contribute to his culpability and is relevant for assessing the appropriate amount of an assessment and penalty. *See* 42 U.S.C. § 1320a-8(c)(2).

**IV.    Whether the Commissioner Had Substantial Evidence or Failed to Consider Certain Evidence in Imposing an Assessment and Penalty of $153,583.60**

Although we agree with the foregoing legal conclusions of the Commissioner, we find that the Commissioner erred in adopting the amount of the DAB's recommended assessment and penalty. First, as to the assessment, the DAB failed to adequately account for the SSA's lack of financial loss and Cappetta's continued disability. Second, as to the penalty *and* assessment, we conclude that the DAB lacked substantial evidence for concluding that Cappetta's work activity was significant, given that the DAB accepted the ALJ's credibility determinations. We address each point below.

Section 1320a-8 authorizes an assessment "in lieu of damages sustained by the United States" for "not more than twice the amount

of benefits or payments paid as a result of . . . such a withholding of disclosure." 42 U.S.C. § 1320a-8(a)(1). For both assessments and penalties, the statute also requires the Commissioner to "take into account"

> (1) the nature of the statements, representations, or actions referred to in subsection (a) of this section and the circumstances under which they occurred; (2) the degree of culpability, history of prior offenses, and financial condition of the person committing the offense; and (3) such other matters as justice may require.

*Id.* § 1320a-8(c); *see also* 20 C.F.R. § 498.106(a).

Section 1320a-8(a)(1) requires the agency to assess the amount of benefits improperly paid when imposing an assessment. Here, however, the DAB failed to adequately consider that the SSA suffered *no loss* whatsoever due to Cappetta's failure to report work activity. The DAB recommended that the Commissioner impose an assessment of $47,583.60—an amount that the DAB stated was "the amount of benefits improperly received by [Cappetta]." AR 51. However, as both the ALJ and DAB held, the evidence that the SSA

44

IG presented does not establish that Cappetta engaged in substantial gainful activity. Based on our review of the applicable statutes and regulations, Cappetta's failure to report by itself did not provide the SSA with the authority to terminate his benefits. *See, e.g.*, 20 C.F.R. § 404.1596 (specifying circumstances under which the SSA may suspend or terminate benefits). As a result, it appears that the SSA could not suspend Cappetta's monthly benefits under these circumstances and that it did not suffer any financial loss. Because the statute is clear that an assessment cannot be "more than twice the amount of benefits or payments paid as a result of the beneficiary's omission," 42 U.S.C. § 1320a-8(a)(3), the maximum assessment available here is zero.

In addition, while the SSA IG investigation was ongoing, SSA once again concluded that Cappetta remained medically disabled for purposes of SSDI benefits. That conclusion further underscores that

Cappetta remained eligible to receive benefits during the period that he failed to report work activity.

Thus, to summarize, the DAB's failure to consider the SSA's loss and Cappetta's continued disability when determining the appropriate assessment was error. Because there is no evidence that the work activity Cappetta failed to report would have disqualified him from receiving benefits, the amount of benefits improperly received is zero. It thus follows that, because the statute caps assessments at "twice the amount of benefits or payments' paid as a result of misrepresentations or omissions," 42 U.S.C. 1320a-8(a)(3), the maximum assessment that the SSA IG may impose on Cappetta would be $0. Because the $47,583.60 assessment exceeds that statutory maximum, we vacate the assessment.

We also conclude that the DAB lacked substantial evidence for the penalty amount because it accepted the ALJ's credibility findings. The DAB's approach resulted in a flawed factual analysis and

undermined key factors supporting the DAB's recommended penalty. *See Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988) (finding administrative decision unsupported by substantial evidence where ALJ failed to "set forth reasons for rejecting consistent and uncontradicted . . . testimony").

As we detailed in our overview of the facts, Cappetta admitted during the SSA IG investigation that he sporadically assisted Cameron and that in return, Cameron helped him with work on his house. However, Cappetta denied being paid for his "work." At the hearing before the ALJ, Cappetta's statements were largely consistent with his interview. For example, Cappetta stated that he did "little things" to assist Cameron, received small payments in exchange or as a gift, received a gift from Cameron to help finance a trip to Italy, and denied that he worked for Cameron.

Cameron's testimony at the hearing was largely consistent with Cappetta's interview and testimony, but inconsistent with what he

previously told the SSA IG investigators. Noting the inconsistencies, the ALJ credited Cameron's hearing testimony, relying on the hearing testimony when it was inconsistent with the statements that Cameron allegedly gave to SSA IG. According to the hearing testimony, Cameron denied that Cappetta worked for him and instead stated that Cappetta would run small errands for him or advise him how to perform certain construction tasks. Cameron also noted that he gave gifts to Cappetta and his family, worked on Cappetta's house, and gave Cappetta funds to pay for the items purchased during errands. However, he denied paying Cappetta any wages. On that record, the ALJ concluded that Cappetta engaged in "work activity," but determined that it was only "sporadic" and that much of work involved running errands for Cameron. AR 133, 135.

The DAB did not disturb the ALJ's credibility findings on appeal. Indeed, the DAB stated its general rule of deferring to the ALJ's weighing of evidence and credibility assessments "absent a

48

compelling reason to do otherwise." AR 49. The DAB then agreed that Cappetta's work activity was "sporadic," as the ALJ had concluded. AR 49.. However, the DAB also determined that the work activity was "significant." AR 50.[11] Having drawn that conclusion, the DAB concluded that the evidence supported an assessment equal to the amount of benefits paid from November 2006 to April 2011, and a penalty of $2,000 per month (out of a possible $5,000 per month).

The DAB lacked substantial evidence for that conclusion for two reasons. First, having accepted the ALJ's credibility findings, the DAB did not have substantial evidence to conclude that Cappetta's work activity was "significant." AR 50. Instead, Cappetta's and

---

[11] To help support this conclusion, the DAB stated that the "ALJ did not discuss as part of his assessment of Peter Cameron's statement to investigators that on the days [Cappetta] did work, he did so for 3–5 hours at a time, and nothing in Peter Cameron's testimony rebuts that statement." AR 50. However, the portion of the transcript that the DAB cites to support that argument rebuts the DAB's statement, or at least calls it into significant doubt. When asked whether Cappetta ever worked for him, Cameron stated "No, he didn't." AR 416. Cameron repeated his denials later in his testimony, and also denied that he told the SSA IG investigator that Cappetta worked for him.

Cameron's testimony—which together form the primary evidence of Cappetta's work activity deemed credible by the agency—show that Cappetta worked for Cameron only on an occasional basis, merely running errands and providing advice on construction techniques. Second, that same testimony from Cappetta and Cameron—which was largely consistent—established only that Cameron at times gave Cappetta and his family small sums of money and performed work on his house in exchange for Cappetta's help. That evidence falls far short of establishing that Cappetta engaged in work activity that can be described as "significant." *See Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (finding that SSA denial of benefits was not supported by substantial evidence because ALJ made findings of fact inconsistent with the record).

The DAB's lack of substantial evidence impaired its weighing of the § 1320a-8 factors and requires the DAB to reconsider the penalty amount on remand. The limited nature of Cappetta's work and

50

earnings is relevant to at least two of these factors: the degree of Cappetta's culpability and the nature of his withholding of information from the SSA. 42 U.S.C. § 1320a-8(c).[12] Specifically, the record contains insufficient evidence to show that Cappetta's sporadic work activity was of such a nature to render the SSA IG's penalty amount reasonable. Additionally, Cappetta's lack of reporting is rendered less culpable by the relatively small amounts he failed to report and the limited nature of the money and compensation that he received (small sums of money and some free

---

[12] Other facts do support the DAB's conclusion that Cappetta bore considerable culpability by failing to report. As the DAB correctly noted, Cappetta testified that he was aware that he must report work activity. Furthermore, Cameron testified that when Cappetta first began to help him with errands and advice, Cappetta informed him that he could only perform small amounts of work in order to continue receiving SSDI benefits. Although the DAB did not mention that second part of Cameron's testimony in its decision, that statement provides further evidence of Cappetta's culpability. Our decision does not discount the relevance of these factors—indeed, the DAB can and should consider those facts. Rather, our view of the evidence and criticism of the DAB's decision results from the DAB's own decision to adhere to the ALJ's credibility findings and weighing of the evidence, as well as the limited evidence that the SSA IG put forth at the hearing.

labor on his house). On remand, the DAB must account for these facts when imposing a penalty.

**CONCLUSION**

Our decision affirms the Commissioner's authority to impose an assessment and penalty in cases where a beneficiary withholds information relating to work activity even after the initial 24-month period of benefits has passed. However, the agency must adequately support its conclusion that the recipient's conduct and the agency's financial loss merit the imposed assessment and penalty. Here, the record before this Court cannot support the amount of the assessment because the SSA did not suffer financial loss, nor does it support the penalty in light of the DAB's reliance on the ALJ's credibility findings. For the foregoing reasons, we **GRANT** the petition for review, **VACATE** the Commissioner's decision, and **REMAND** for further proceedings consistent with this opinion.